IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2013 MAY 30   PM 3:58

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

CATHOLIC LEADERSHIP COALITION OF
TEXAS d/b/a Texas Leadership Coalition, et al.,
                    Plaintiffs,

-vs-                                                    Case No.  A-12-CA-566-SS

DAVID A. REISMAN, in his official capacity as
Executive Director of the Texas Ethics
Commission, et al.,
                    Defendants.

_____

# O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendants Hugh Akin, Jim Clancy, Tom Harrison, Paul Hobby, Bob Long, Paula

Mendoza, Tom Ramsay, David Reisman, and Chase Untermeyer (collectively, the TEC

Defendants)'s Motion for Summary Judgment [#60], Plaintiffs Catholic Leadership Coalition of

Texas, Texas Leadership Coalition-Institute for Public Advocacy, Friends of SAFA Texas, and

Texas Freedom PAC's Response [#64], and the TEC Defendants' Reply [#67]; Plaintiffs' Motion

for Summary Judgment [#62], the TEC Defendants' Response [#63], and Plaintiffs' Reply [#66];

and Defendant Bexar County Criminal District Attorney Susan Reed's Second Motion to Dismiss

or, in the alternative, Motion for Summary Judgment [#61], and Plaintiffs' Response [#65]. Having

reviewed the documents, the governing law, and the file as a whole, the Court now enters the

following opinion and orders.



## Background

Plaintiffs filed this suit to challenge the constitutionality of various campaign finance laws in the state of Texas. Although the statutes themselves are fairly straightforward, they are mired in the language of election law and thus require considerable description before they are fully intelligible. Similarly, though Plaintiffs are all interested in influencing Texas politics, the manner the Plaintiffs have chosen to use differ somewhat, and therefore also require explanation. The Court turns first to the statutes which form the basis of Plaintiffs' complaint, and then to the Plaintiffs themselves.

### I.       Statutory Scheme

The challenged statutes, all portions of the Texas Election Code, include (1) a number of registration, reporting, and disclosure requirements imposed upon certain political committees, and (2) specific restrictions on certain political contributions by corporations.

### A.       Reporting and Disclosure Requirements

Texas Election Code section 253.037(a) provides:

A general-purpose committee may not knowingly make or authorize a political contribution or political expenditure unless the committee has:

> (1)   filed its campaign treasurer appointment not later than the 60th day before the date the contribution or expenditure is made; and

> (2)   accepted political contributions from at least 10 persons.

TEX. ELEC. CODE § 253.037(a). The statute's appearance is deceptive, as nearly every word or phrase used is defined elsewhere in the Texas Election Code, with some definitions themselves involving other specially defined terms. Related to section 253.037(a), and also a subject of this lawsuit, is section 253.031(b), which provides:

> A political committee may not knowingly accept political contributions totaling more than $500 or make or authorize political expenditures totaling more than $500 at a time when a campaign treasurer appointment for the committee is not in effect.

*Id.* § 253.031(b). These two statutory provisions thus regulate particular groups ("political committees") by restricting the way those groups can receive and spend funds ("political contributions" and "political expenditures").

Turning first to the particular groups, the Texas Election Code defines a "political committee" as "a group of persons that has as a principal purpose accepting political contributions or making political expenditures." *Id.* § 251.001(12). Political committees are further broken down with more tailored definitions of "specific-purpose committee" and "general-purpose committee." A general-purpose committee is defined as:

> a political committee that has among its principal purposes:
>
> (A)  supporting or opposing:
>
> > (i)  two or more candidates who are unidentified or are seeking offices that are unknown; or
> >
> > (ii)  one or more measures that are unidentified; or
>
> (B)  assisting two or more officeholders who are unidentified.

*Id.* § 251.001(14). Building on this definition, a specific-purpose committee is defined as:

> a political committee that does not have among its principal purposes those of a general-purpose committee but does have among its principal purposes:
>
> (A)  supporting or opposing one or more:
>
> > (i)  candidates, all of whom are identified and are seeking offices that are known; or
> >
> > (ii)  measures, all of which are identified;

(B)  assisting one or more officeholders, all of whom are identified; or

(C)  supporting or opposing only one candidate who is unidentified or who is seeking an office that is unknown.

*Id.* § 251.001(13). Regardless of which form a political committee takes, it may not accept political contributions, or make political expenditures, totaling more than $500 unless it has designated a campaign treasurer. *Id.* §§ 253.031(b), 252.001.

A "political contribution" is defined as "a campaign contribution or an officeholder contribution." *Id.* § 251.001(5). A "campaign contribution" is "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure," regardless of when the contribution is made. *Id.* § 251.001(3). An "officeholder contribution" is "a contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that: (A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public money." *Id.* § 251.001(4).[1]

A "political expenditure" follows the trend, and is defined as "a campaign expenditure or an officeholder expenditure." *Id.* § 251.001(10). A "campaign expenditure" is "an expenditure made by any person in connection with a campaign for an elective office or on a measure," regardless of when the expenditure is made. *Id.* § 251.001(7). An "officeholder expenditure" is "an expenditure made by any person to defray expenses that: (A) are incurred by an officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public

---

[1] Of course, the word "contribution" as it is used in these various definitions is itself further defined in part as: "a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer." TEX. ELEC. CODE § 251.001(2).

money." *Id.* § 251.001(9).[2] The expenditure category also includes a third member, the "direct campaign expenditure," which is defined as "a campaign expenditure that does not constitute a campaign contribution by the person making the expenditure." *Id.* § 251.001(8).[3]

Combining these various definitions, a general-purpose committee is required to appoint a campaign treasurer before it is allowed to receive or spend more than $500 in political contributions or political expenditures. The campaign treasurer is charged with maintaining "a record of all reportable activity." *Id.* § 254.001(b). For example, general-purpose committees must file, through their campaign treasurer, semiannual reports identifying the candidates and measures supported or opposed by the committee, the names of contributors who donated more than $50, and information on the committee's political expenditures. *Id.* §§ 254.031, .151, .153. If the general-purpose committee is involved in an election, the campaign treasurer must also file additional reports thirty days and eight days before the election. *Id.* § 254.154. Large contributions or expenditures made within nine days of an election also trigger next-day reporting requirements. *Id.* § 254.039.

In addition to the campaign treasurer appointment requirement, the Texas Election Code imposes two further burdens on a general-purpose committee before it is allowed to receive or spend more than $500. First, the committee must wait sixty days from the day it files its campaign treasurer appointment. *Id.* § 253.037(a)(1). Second, the committee must accept political contributions from

---

[2] "Expenditure" is also defined as "a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment."*Id.* § 251.001(6).

[3] A "direct campaign expenditure" in Texas is the equivalent of an "independent expenditure" under federal law. *Osterberg v. Peca*, 12 S.W.3d 31, 36 n.2 (Tex. 2000) ("What Chapter 253 defines as a 'direct campaign expenditure' corresponds with what the Federal Election Campaign Act and United States Supreme Court call an 'independent expenditure.'").

at least ten persons. *Id.* § 253.037(a)(2). Violating section 253.037(a) is a Class A misdemeanor, and may also result in criminal and civil penalties. *Id.* §§ 253.037(d), .134.

**B.      Corporate Contribution Restrictions**

Section 253.094(a) reads: "A corporation or labor organization may not make a political contribution that is not authorized by this subchapter." *Id.* § 253.094(a). Drawing on the same definitions recounted above, this section generally prohibits corporations from transferring money (or any other thing of value) directly to a candidate or a political committee in connection with a campaign for elective office. Violating section 253.094(a) is a third degree felony. *Id.* § 253.094(c). Section 253.094(a) previously prohibited corporate political expenditures as well, but the Texas legislature removed all references to political expenditures after this Court ordered them stricken as unconstitutional in light of the United States Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). *See Tex. Mun. Police Ass'n v. Tex. Ethics Comm'n*, No. A-08-CA-741-SS, slip op. at 16–17 (W.D. Tex. Oct. 29, 2010).

**II.     Plaintiffs**

Plaintiffs are various Texas organizations interesting in influencing Texas politics, either directly or through associated political committees. Catholic Leadership Coalition of Texas, which operates as the Texas Leadership Coalition (TLC), is a 501(c)(4) "social welfare" nonprofit based in San Antonio, Texas. TLC describes its mission as "develop[ing] resources and opportunities to inform Catholics about the moral precepts of the Church pertaining to their responsibilities as Catholic voters." 2d Am. Compl. [#49] ¶ 10. In order to retain tax-exempt status under the Internal Revenue Code, TLC must limit the amount of direct political advocacy it engages in. It therefore

spawned the Texas Leadership Coalition-Institute for Public Advocacy (TLC-IPA), a political committee, to support or oppose candidates based on issues important to TLC.

TLC-IPA is a general-purpose committee under Texas law. When this lawsuit was initially filed, TLC-IPA was interested in financially supporting candidates in a 2012 Texas primary runoff election, but was prohibited from doing so by the 60-day, 10-contributor requirements in section 253.037(a). TLC-IPA is also interested in giving money directly to candidates, and has done so in the past. Def.'s Mot. Summ. J. [#60-5], Ex. B (Sevilla Depo.), at 88:3–9, 98–99, 101:19–22.

Plaintiff Friends of SAFA Texas (FOSAFA) is also a general-purpose committee. FOSAFA is the political committee created by the San Antonio Family Association (SAFA) in order to preserve SAFA's tax-exempt status. Like TLC-IPA, FOSAFA was prohibited from participating in the 2012 primary runoff election by the 60-day, 10-contributor requirements. Also like TLC-IPA, FOSAFA desired to give money directly to candidates. *Id.* [#60-6], Ex. C (Von Dohlen Depo.), at 41:18–23.

Plaintiff Texas Freedom PAC is also a general-purpose committee, formed to contribute in-kind professional campaign services to local candidates, and to recruit candidates for local and state elections. Like the other Plaintiffs, Texas Freedom was prohibited by section 253.037(a) from spending funds immediately after it registered in June 2012.

## III.    Procedural History

Plaintiffs filed this suit on June 28, 2012, seeking a preliminary injunction against the enforcement of the challenged provisions of the Texas Election Code, which would have allowed them to spend funds in the days leading up to the July 31, 2012 primary runoff election. This Court

denied the motion. Order of July 20, 2012 [#32]. Plaintiffs immediately appealed, but the Fifth Circuit affirmed, as it was "unpersuaded that there is a likelihood of success on the merits of [Plaintiffs'] First Amendment challenge to the sixty-day waiting period in TEX. ELEC. CODE § 253.037(a)(1)." *Catholic Leadership Coal. of Tex. v. Reisman*, No. 12-50732, slip op. at 2 (5th Cir. July 25, 2012). The parties have now completed their discovery, and have filed cross-motions for summary judgment.

## Analysis

### I.   Motions for Summary Judgment—Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23. The parties agree there are no factual disputes at this stage, as the issues before the Court are purely legal questions.

## II.    Application

Plaintiffs have raised both facial and as-applied challenges to the Texas Election Code provisions at issue in this case. In the First Amendment context, the overbreadth doctrine holds "a

statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The United States Supreme Court has recognized "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects," and therefore requires "a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* "Invalidation for overbreadth is strong medicine that is not to be casually employed." *Id.* at 293 (internal quotation marks omitted); *see also Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("Facial challenges to the constitutionality of statutes should be granted 'sparingly and only as a last resort,' so as-applied challenges are preferred." (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973))).

Regardless of the form Plaintiffs' challenges take, both sides offer a variety of arguments against and in support of the statute. First, the TEC Defendants contend much of this case is moot because the elections Plaintiffs wished to influence have already occurred and Plaintiffs now meet the 60-day, 10-contributor requirements for all future elections. Second, Plaintiffs argue section 253.037(a) is an unconstitutional prior restraint on political speech and association. Third, Plaintiffs argue section 253.037(a) is an impermissible restriction on political contributions. Fourth, Plaintiffs contend section 253.037(a) is similarly unconstitutional to the extent it restricts political expenditures. Fifth, Plaintiffs challenge section 253.037(a)(2)'s ten-contributor requirement, arguing it amounts to forced political association. Finally, Plaintiffs argue section 253.094(a)'s prohibition on corporate contributions is unconstitutional as applied to TLC and TLC-IPA.

### A.     Mootness

The mootness doctrine, sometimes referred to as "'the doctrine of standing in a time frame,'"[4] reflects the need for litigants to present an actual, live controversy to the court at all times during the pendency of the lawsuit. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). The TEC Defendants contend there is no longer a live controversy between the parties with respect to section 253.037(a) because all the Plaintiffs have now had their campaign treasurer appointments on file for sixty days and have accepted contributions from at least ten persons, meaning the statute will not prohibit them from engaging in advocacy in any future election.

There is a well-established exception to the mootness doctrine for "disputes capable of repetition, yet evading review." *Davis v. FEC*, 554 U.S. 724, 735 (2008) (internal quotation marks omitted). This exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (internal quotation marks omitted). The Court finds this exception applicable in this case.

With respect to the first requirement, "[c]ontroversy surrounding election laws, including campaign finance regulations, is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course." *Carmouche*, 449 F.3d at 661. For this reason, the Fifth Circuit has

---

[4] *But see Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("[I]f mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist.").

specifically noted cases "challenging the validity of state election laws are classic examples of cases in which the issues are capable of repetition, yet evading review." *Id.* (internal quotation marks omitted). This case is a fine illustration: Plaintiffs filed a lawsuit challenging a 60-day waiting period within sixty days of an election. It would be a truly extraordinary case which could travel from initial complaint to resolution on the merits in under two months. *See Davis*, 554 U.S. at 735 ("Similarly, in this case despite [the statute's] mandate to expedite and Davis' request that his case be resolved before the [2006] general election season commenced, Davis' case could not be resolved before the 2006 election concluded, demonstrating that his claims are capable of evading review."); *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462–63 (2007) (*WRTL*) (despite statutory mandate to expedite review, challenge to election law could not be resolved before election concluded).

Taken at face value, the second prong of the exception—a reasonable expectation Plaintiffs themselves will be affected by these statutes in the future—would admittedly be a difficult, if not outright impossible, hurdle for these Plaintiffs to clear. But as the Fifth Circuit has recognized, the United States Supreme Court "does not always focus on whether a particular plaintiff is likely to incur the same injury." *Carmouche*, 449 F.3d at 662. There are numerous examples of the Court rejecting mootness challenges to election laws on the basis of future injury to nonparties. *See, e.g.*, *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) ("The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections."); *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972) (affirming district court's rejection of a mootness challenge, noting "[a]lthough appellee now can vote, the problem to

voters posed by the Tennessee residence requirements is capable of repetition, yet evading review" (internal quotation marks omitted)).

*Carmouche* itself followed the same approach. There, the Center for Individual Freedom had challenged Louisiana's Campaign Finance Disclosure Act as violative of the First Amendment. *Carmouche*, 449 F.3d at 658. Before the Fifth Circuit could rule, the election the Center wished to influence through its speech passed. While the Fifth Circuit recognized the Center's representation it intended to participate in future elections in Louisiana, the court held the case would not have been moot "even if it were doubtful that the Center would again attempt to engage in election-related speech in Louisiana . . . because other individuals certainly will be affected by the continuing existence of the CFDA." *Id.* at 662.

If there is any doubt left as to the applicability of the capable of repetition, yet evading review exception, this Court's previous rulings involving the TEC should dispel it. For example, this Court rejected a similar mootness defense advanced against a previous challenge to section 253.094 in the wake of *Citizens United. See Tex. Mun. Police Ass'n v. Tex. Ethics Comm'n*, No. A-08-CA-741-SS, slip op. at 7–10 (W.D. Tex. Oct. 29, 2010). Additionally, in this very case, the Court previously noted the specter of mootness lurking in the background of Defendant Susan Reed's motion to dismiss, and held the case was not moot because of the capable of repetition, yet evading review exception. Order of Jan. 10, 2013 [#58], at 7–8. There have been no material changes in this case since January, and the Court's conclusion remains the same.

Finally, virtually all the policy considerations driving the mootness doctrine counsel in favor of resolving this case rather than dismissing it. As the United States Supreme Court has noted, "by

the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 191–92 (2000); *see also Honig v. Doe*, 484 U.S. 305, 330–32 (1988) (Rehnquist, C.J., concurring) (discussing the pragmatic history of the capable of repetition, yet evading review exception). To dismiss this case as moot after both parties have completed discovery and filed half a dozen briefs on the merits of the constitutional challenge would be wasteful, and would also deprive the numerous other political committees across the state of an opportunity for clarity in the challenged provisions of the Texas Election Code. The Court therefore finds this case is not moot.

## B.    Prior Restraint

Plaintiffs argue section 253.037(a)'s registration and disclosure requirements impose three independently impermissible prior restraints on political speech: (1) general-purpose committees are not allowed to engage in speech until they can find and appoint a campaign treasurer; (2) once a treasurer is appointed, the general-purpose committee must then wait sixty days; and (3) the general-purpose committee must find at least ten persons to contribute before being allowed to engage in more than a *de minimis* amount of political speech. The TEC Defendants counter section 253.037(a)'s requirements simply do not amount to a prior restraint, and attempt to distinguish the line of cases relied upon by Plaintiffs.

As the United States Supreme Court has described it, "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S.

544, 550 (1993) (internal quotation marks and alterations omitted). The Court has listed temporary restraining orders and permanent injunctions as "classic examples of prior restraints." *Id.* While a prior restraint is "not unconstitutional per se," there is "a heavy presumption against its constitutional validity." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (internal quotation marks omitted).

The prior restraint doctrine is rooted in founding-era concerns over freedom of the press and government censorship. *See Near v. Minn. ex rel. Olson*, 283 U.S. 697, 713–15 (1931). Typical prior restraint cases involve attempts by the government to restrict expression through some discretionary permitting or licensing scheme, or through the judicial machinery. *See, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 543–44 (1976) (court order prohibiting news media from publishing information about criminal trial); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (government brought suit to enjoin newspaper publication of the Pentagon Papers); *Freedman v. Maryland*, 380 U.S. 51, 52–53 (1965) ("State Board of Censors" required to issue license before any film could be exhibited); *Bantam Books v. Sullivan*, 372 U.S. 58, 59–61 (1963) (Rhode Island established board to ban books and periodicals deemed unsuitable for minors); *Lovell v. City of Griffin*, 303 U.S. 444, 447–48 (1938) (city ordinance requiring permit from city manager to distribute printed material); *Near*, 283 U.S. at 701–02 (state law prohibiting publication of "scandalous" newspapers).

The critical difference between section 253.037(a) and the vast majority of the United States Supreme Court's prior restraint cases should be immediately apparent. Section 253.037(a) does not require political committees to seek a license or permit, nor must such committees be "approved"

by any authority figure. Rather, the statute requires general-purpose committees to appoint a campaign treasurer of their choosing, wait sixty days, and collect contributions from ten persons before receiving or spending more than $500. All general-purpose committees are subject to the same requirements. Injunctions and restraining orders lie at the heart of the prior restraint doctrine, *Alexander*, 509 U.S. at 550, but this case involves neither.

Rather than rely on these core prior restraint cases, which tellingly have little in common with the statutes challenged here, Plaintiffs invoke two other cases they believe demonstrate the unconstitutionality of registration requirements like the one contained in section 253.037(a). The first involved a Texas law requiring labor organizers to obtain an "organizer's card"—essentially a license—before they were allowed to solicit new members. *Thomas v. Collins*, 323 U.S. 516, 518 (1945). The United States Supreme Court found the licensing scheme unconstitutional, holding "a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Id.* at 540. The second involved an Ohio law requiring individual citizens to seek "Solicitation Permits" before going door-to-door and promoting any cause. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 154–56 (2002). Even though the permits were universally granted to all applicants, the Court struck down the measure, scoffing at the idea "that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Id.* at 166.

Neither of these cases helps Plaintiffs build a case against the statute at issue here. The primary difference between the statutes at issue in *Thomas* and *Watchtower Bible* and section

253.037(a) is the scope of the statutes themselves. In both of those cases, individuals were completely prohibited from speaking—at least on certain topics—without first obtaining permission from some governmental body. In Texas, individuals remain free to speak at will about matters of political interest to them. Nothing in section 253.037(a) prevents the individual members of a general-purpose committee from speaking out in favor of a candidate or against a ballot measure. Those individuals are also free to donate to candidates, subject perhaps to various federal and state campaign finance restrictions not at issue here. Even the core Plaintiff-related groups—for example, TLC and SAFA, rather than their political spin-offs—are free to speak without any registration whatsoever. TLC and SAFA can take full advantage of the freedom afforded them by *Citizens United* and make large donations from their corporate coffers. The fact they cannot do so without losing their coveted tax-exempt status is of no importance to the constitutionality of section 253.037(a).

In addition to these general forms of political speech, Plaintiffs here could also have formed specific-purpose committees to support individual candidates or ballot measures. Specific-purpose committees are not subject to section 253.037(a)'s three requirements. Even the general-purpose committees are free to speak once the campaign treasurer has been appointed, provided the committees do not spend more than $500. Given the proliferation of social media platforms and other inexpensive communication avenues, the practical amount of speech a general-purpose committee could produce while spending less than $500 is likely significant.

The other crucial difference between this case and *Thomas*, *Watchtower Bible*, and a number of the core prior restraint cases listed above, is the absence of any "petty official" making determinations as to whether Plaintiffs' speech will be allowed. *See Watchtower Bible*, 536 U.S. at

167. General-purpose committees are required to file a document appointing a campaign treasurer. This registration requirement involves no discretion whatsoever; in fact, it does not even involve a government decision maker. Further distinguishing this case is the fact Plaintiffs are never required to submit their actual speech for review. There is no board of censors reviewing Plaintiffs' advertisements, no city official scrutinizing their topics of conversation, and no licensing body demanding to know which cause they seek to champion. *See Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973) (political-party registration requirement "did not prohibit the petitioners from voting . . . [i]t merely imposed a legitimate time limitation on their enrollment, which they chose to disregard"). When combined with the universal application of section 253.037(a)'s requirements, the core policy motivating the prior restraint doctrine—the fear of government censorship—is wholly absent in this case. *See Thomas v. City of Chic.*, 534 U.S. 316, 322 (2002) (upholding content-neutral licensing scheme requiring individuals to seek permits from the Park District if a public gathering is going to exceed fifty participants).

The purpose of section 253.037(a) is also relevant to the analysis, and confirms the statute is not a prior restraint. *See id.* (discussing the legitimate, content-neutral purposes of the licensing scheme). The legislative history confirms section 253.037(a) was adopted in part to address a problem the Texas legislature had identified with the "[l]ast minute formation of general-purpose political committees for the purpose of avoiding filing requirements." Def.'s Mot. Summ. J. [#60-3], Ex. A-3 (Bill Analysis of SB 1068, 69th R.S. (1985)). Registering a campaign treasurer—and thus identifying a responsible party to submit the numerous reports required by the Texas Election Code—supports the Texas Election Code's larger disclosure scheme. The United States Supreme

Court itself recognized disclosure requirements can be sufficiently important to overcome First Amendment concerns, because disclosure requirements keep the electorate informed, deter corruption and the appearance of corruption, and enable regulators to enforce laws limiting campaign spending in various ways. *See Buckley v. Valeo*, 424 U.S. 1, 66–68 (1976); *see also Corsi v. Elecs. Comm'n*, 981 N.E.2d 919, 925 (Ohio Ct. App. 2012) (upholding state reporting and disclosure requirements imposed on political action committees, including the requirement to designate a treasurer).

In summary, the Court finds section 253.037(a) does not constitute a prior restraint in violation of the First Amendment. The statute does not prevent anyone from speaking; rather, it enables a disclosure and reporting scheme designed to promote the legitimate governmental interests repeatedly recognized by the United States Supreme Court. Moreover, because section 253.037(a)'s requirements are unlike the licensing or permitting requirements prevalent in so many prior restraint cases, there is no fear of censorship as a result of the statute's trio of requirements. If political speakers in Texas wish to avail themselves of the special benefits of a general-purpose committee, they must comply with three simple rules. Those rules do not amount to a prior restraint.

## C.    Contribution and Expenditure Limits

Plaintiffs argue section 253.037(a), by virtue of its three requirements, effectively bans general-purpose committees from accepting political contributions and making political expenditures, and therefore violates the First Amendment. The TEC Defendants construe section 253.037(a) not as a contribution or expenditure ban, but rather as a disclosure obligation. The TEC

Defendants also analogize Texas's scheme to similar schemes used at the federal level and approved of by the United States Supreme Court.

1.    **Standard of Review**

The first question for the Court is what level of scrutiny to apply to section 253.037(a). To the extent the statute bans political expenditures, it is subject to strict scrutiny, which means the Government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (internal quotation marks omitted). By contrast, contribution restrictions are subject to "the lesser demand of being closely drawn to match a sufficiently important interest." *FEC v. Beaumont*, 539 U.S. 146, 162 (2003) (internal quotation marks omitted); *see also id.* at 161 ("Going back to *Buckley v. Valeo*, . . . restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression.").

There is, however, a third option in this case. If section 253.037(a) is not a contribution or expenditure ban at all, neither standard recited above is applicable. If the statute is instead treated as a disclosure requirement, the standard of review becomes "exacting scrutiny," which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010) (quoting *Citizens United*, 558 U.S. at 366).

For the reasons stated below, the Court concludes section 253.037(a) is in essence a disclosure obligation, not a contribution or expenditure ban. Applying exacting scrutiny, the Court finds section 253.037(a) is constitutional.

## 2.      Section 253.037(a) as a Disclosure Obligation

As the United States Supreme Court explained in *Citizens United*, "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' *Buckley*, 424 U.S. at 64 . . . and 'do not prevent anyone from speaking,' *McConnell* [*v. FEC*, 540 U.S. 93, 201 (2003)] (internal quotation marks and bracket omitted)." 558 U.S. at 366. Both characteristics are true of section 253.037(a) and its three requirements. Appointing a campaign treasurer, waiting sixty days, and collecting contributions from ten donors does not impose a ceiling of any sort on Plaintiffs' campaign activities. To the contrary, once those requirements are satisfied, general-purpose committees in Texas are free to engage in as much speech as they want.[5] Section 253.037(a) also does not prevent anyone from speaking. As discussed in some detail above, would-be political speakers in Texas have a variety of avenues available to them to engage in political speech without forming a general-purpose committee, from engaging in individual speech (whether by actually speaking or by spending money) to forming specific-purpose committees, which are not subject to the sixty-day, ten-contributor limits.

------

[5] In fact, general-purpose committees may be able to engage in *more* speech than specific-purpose committees, because specific-purpose committees may be subject to additional contribution limitations. *See* TEX. ELEC. CODE § 253.034(a)(3) (prohibition on political contributions to specific-purpose committees "supporting, opposing, or assisting a statewide officeholder or member of the legislature" within thirty days of a regular legislative session, and for twenty days following the adjournment of such a session); *id.* § 253.153(a) (similar requirement for specific committees related to judicial candidates).

The lines of cases relied upon by the parties bear out this distinction. Plaintiffs have built their case against section 253.037(a) on the back of *Citizens United* and its progeny, but those cases dealt with outright bans or monetary caps on contributions or expenditures. *See Citizens United*, 558 U.S. at 365–66 (invalidating statute banning independent expenditures by corporations); *Davis*, 554 U.S. at 742–44 (invalidating "Millionaire's Amendment," which raised contribution and expenditure limits for candidates whose opponents spent more than $350,000 of their own money); *WRTL*, 551 U.S. at 477–82 (invalidating statute banning corporations from paying for any "electioneering communication"); *Randall v. Sorrell*, 548 U.S. 230, 262 (2006) (invalidating both contribution and expenditure limits); *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 614–15 (1996) (invalidating monetary cap on independent expenditures); *Buckley*, 424 U.S. at 35–39, 51–58 (upholding ceilings on contributions, but invalidating caps on expenditures). Section 253.037(a) does not impose any limits on either contributions or expenditures.[6]

Cases involving disclosure obligations have been more forgiving, frequently upholding the various requirements imposed on would-be political speakers. *See Citizens United*, 558 U.S. at 368–71 (upholding disclaimer and disclosure requirements); *Buckley*, 424 U.S. at 84 (upholding disclosure and reporting requirements). Even in the wake of *Citizens United*, disclosure and reporting requirements have routinely withstood constitutional challenges. *See, e.g.*, *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 490 (7th Cir. 2012) (upholding disclosure requirements, noting "[t]he need for an effective and comprehensive disclosure system is especially valuable after *Citizens*

---

[6] At most, one could argue section 253.037(a) places a temporary cap of $500 on contributions and expenditures while a general-purpose committee waits sixty days and finds ten contributors. The Court finds this distinction—temporary versus permanent—to be significant, especially in light of other available avenues for political speech and the fact a general-purpose committee can be formed well in advance of an election.

*United*"); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 56–61 (1st Cir. 2011) (upholding registration, reporting, and record-keeping requirements); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1013 (9th Cir. 2010) (upholding registration and reporting requirements); *Vt. Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 396 (D. Vt. 2012) (upholding disclosure requirements, including requirement to designate a campaign treasurer); *Corsi*, 981 N.E.2d at 925 (upholding similar requirements because they "do not prohibit the [plaintiff] from expressing its views").

Admittedly, there are distinctions to be drawn between section 253.037(a) and either category described above. Section 253.037(a) does not impose caps or bans on expenditures like so many of the statutes the United States Supreme Court has invalidated, but it does unquestionably impose some limitation on speech during the sixty-day waiting period. Unlike some invalidated statutes, however, general-purpose committees can fully control the timing of the sixty-day window by choosing when to designate their campaign treasurer, so the problem of government silencing speech during a particular time frame (e.g., twenty-one days before an election) is absent. Texas's statute is also not directly analogous to the disclosure line of cases cited above, as those cases generally involved challenges to the actual reporting requirements, rather than the registration obligations making those reporting requirements possible.

The summary judgment record compels the Court to view section 253.037(a) as an anti-circumvention provision designed to make enforcement of the Texas Election Code's various disclosure obligations possible. Like the disclosure provision upheld in *Buckley*, section 253.037(a) is "responsive to the legitimate fear that efforts would be made, as they had been made in the past,

to avoid the disclosure requirements." 424 U.S. at 76 (footnote omitted). The legislative history reveals the statute was in part a direct response to the efforts of some to avoid previous reporting requirements by registering as a general-purpose committee at the last minute. Def.'s Mot. Summ. J. [#60-3], Ex. A-3 (Bill Analysis of SB 1068, 69th R.S. (1985)); *id.* [#60-4], Ex. A-4 (Bill Analysis of SB 42, 68th R.S. (1983)). The Texas statute therefore "facilitates the enforcement of the disclosure provisions" by ensuring all general-purpose committees have identified a responsible party to handle their reporting requirements, and have done so in time to satisfy the general-purpose committee's reporting deadlines. *See id.* at 84.

### 3.    Applying Exacting Scrutiny

Having concluded section 253.037(a) is in essence a disclosure requirement, the next question is whether there is "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Reed*, 130 S. Ct. at 2818 (quoting *Citizens United*, 558 U.S. at 366). The Court concludes there is, and the statute therefore survives exacting scrutiny and does not offend the First Amendment.

There are a number of "sufficiently important" governmental interests at stake in this case. The United States Supreme Court recognized three such interests in *Buckley*: (1) providing the electorate with information about the sources of political funds; (2) deterring actual corruption, and the appearance of corruption, by publicizing large contributions and expenditures and their sources; and (3) "gathering the data necessary to detect violations" of campaign spending regulations. 424 U.S. at 67–68. These interests were also recognized in *Citizens United*. 558 U.S. at 368–71.

-24-

Texas's statute bears a substantial relation to these interests. The statute requires the appointment of a campaign treasurer, which ensures someone within the general-purpose committee will be responsible for fulfilling the committee's reporting requirements. *See Vt. Right to Life Comm.*, 875 F. Supp. 2d at 396 (upholding treasurer-designation requirement as reasonable and substantially related to state's interest in transparency). It further requires general-purpose committees to wait sixty days before expending substantial sums, which prevents the problem the Texas legislature specifically identified of general-purpose committees forming on the eve of elections and rapidly spending funds. *See McConnell*, 540 U.S. at 200 ("Given the relatively short timeframes in which electioneering communications are made, the interest in assuring that disclosures are made promptly and in time to provide relevant information to voters is unquestionably significant."). Moreover, because the general-purpose committees themselves can control when this sixty-day window occurs, the burden imposed by the waiting period is minimal, and cannot possibly affect any general-purpose committee more than once. Finally, the statute requires the general-purpose committee to collect from ten contributors, which ensures the committee is actually a committee and not merely an individual seeking to disguise his or her personal contributions. There is no evidence in the record compliance with these requirements is particularly onerous, expensive, or time consuming.[7]

---

[7] The Court therefore rejects Plaintiffs' argument their committee status imposes "onerous burdens" on them. *WRTL*, 551 U.S. at 477 n.9. Vague references to the Texas Election Code in general are insufficient to establish any real burden. There are also differences between the federal political action committee (PAC) requirements labeled onerous by the United States Supreme Court and individual state regulations. *See McKee*, 649 F.3d at 56 (distinguishing federal-law PACs from Maine PACs, and concluding Maine's registration, reporting, and record-keeping requirements were not "onerous").

Plaintiffs argue section 253.037(a) is ill-suited to combating corruption because wealthy individuals and corporations may spend at will, while groups of individuals are subjected to the statute's restrictions. While it is true the *Buckley* court recognized the "right to join together for the advancement of beliefs and ideas . . . is diluted if it does not include the right to pool money through contributions," nothing in section 253.037(a) *prevents* individuals from doing so. 424 U.S. at 65–66 (internal quotation marks and citations omitted). The entire goal of general-purpose committees is to facilitate the pooling of resources, and a properly registered general-purpose committee is free to spend money and advance the beliefs of its members. The Texas legislature has determined such groups are subject to certain unquestionably constitutional disclosure requirements, and must take three simple steps to ensure those requirements are enforceable. These minor, one-time requirements do not render section 253.037(a) unconstitutional.

The constitutionality of Texas's scheme is confirmed by reference to the federal scheme for political action committees (PACs). In *Buckley*, the Court upheld a federal statute which raised the contribution ceiling for PACs which had been registered for at least six months and had received contributions from more than fifty persons. 424 U.S. at 35–36.[8] The Court explicitly noted the statute's "permissible purpose of preventing individuals from evading the applicable contribution limits by labeling themselves committees." *Id.* Section 253.037(a) similarly prevents individuals from evading Texas's campaign finance regulations by registering as committees shortly before election day.

---

[8] This requirement still exists today. *See* 2 U.S.C. § 441a(4) (defining "multicandidate political committee" as "a political committee which has been registered . . . for a period of not less than 6 months, which has received contributions from more than 50 persons and . . . has made contributions to 5 or more candidates for Federal office").

The circuit court decision in *Buckley*, which the United States Supreme Court affirmed in relevant part, provides further support for this idea. The D.C. Circuit held the statute's six-month registration requirement "does *not* prevent individuals from drawing together to act as a political committee at any time." *Buckley v. Valeo*, 519 F.2d 821, 857 (D.C. Cir. 1975), *aff'd in part and rev'd in part*, 424 U.S. 1 (1976) (emphasis added). Instead, the court viewed the statute as "a loophole-closing provision intended to prevent proliferation of dummy committees, each of a few persons, in support of federal candidacies." *Id.* The same is true of section 253.037(a), which the Texas legislature specifically conceived of as a loophole-closing provision designed to prevent general-purpose committees from circumventing the Texas Election Code's reporting requirements. Just as the United States Supreme Court and the D.C. Circuit upheld this federal registration and disclosure scheme, this Court upholds Texas's registration and disclosure scheme as implemented through section 253.037(a).

## D.     Ten-Contributor Requirement

Plaintiffs contend section 253.037(a)'s ten-contributor requirement amounts to "forced political association" by requiring an individual to join with at least nine others before expending more than $500 through a general-purpose committee. The TEC Defendants counter the ten-contributor limit, much like the federal fifty-contributor component of multicandidate PACs, is constitutionally permissible.

"Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25 (internal

quotation marks omitted). Section 253.037(a)(2) easily meets this burden. First, there are a number of sufficiently important interests at stake here: those generally identified in *Buckley* as the government's interests in promoting a transparent campaign finance system.

Second, Texas's solution is closely drawn. The requirement is a direct response to a problem the Texas legislature identified with last-minute general-purpose committees. *Buckley* recognized a similar problem with circumvention of disclosure requirements has existed at the federal level since shortly after the first federal disclosure law was enacted in 1910. *See* 424 U.S. at 61–62. General-purpose committees are by their very nature opaque organizations: they need not identify particular candidates or ballot measures they wish to support, and can therefore expend funds in support of numerous different initiatives in any given election cycle. By contrast, specific-purpose committees are necessarily targeted at specific candidates or measures. Section 253.037(a)(2)'s ten-contributor requirement—a requirement which does not apply to specific-purpose committees—thus reflects the need to ensure these potentially wide-ranging general-purpose committees are actual committees.[9] To the extent two individuals wish to band together to support an extraordinarily unpopular candidate or cause for which they cannot find eight other supporters, they remain free to form a specific-purpose committee.

Plaintiffs reliance on *Free Market Foundation v. Reisman*, 540 F. Supp. 2d 751 (W.D. Tex. 2008), is misplaced. In *Free Market Foundation*, the plaintiffs challenged a provision of the Texas Election Code "forbid[ding] individuals from making any independent expenditures to influence the

---

[9] Whether ten contributors is the appropriate threshold is a question for the legislature, not this Court. *Cf. Buckley*, 424 U.S. at 30 (deferring to Congress's chosen contribution ceiling because "a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000" (internal quotation marks omitted)).

election for Speaker" of the Texas House of Representatives, subject to two narrow exceptions. *Id.* at 757. The court granted a preliminary injunction, finding the statute infringed plaintiffs' associational rights by forcing them to associate with particular "Speaker candidates" in order to speak about the Speaker election. *Id.* at 758. This ban on independent expenditures was of dubious constitutional stature even in 2008. *See id.* at 757 (noting the United States "Supreme Court has 'routinely struck down limitations on independent expenditures'" (quoting *Colo. Republican*, 533 U.S. at 441)).

Section 253.037(a)(2) imposes no such obligation. Most importantly, it is not a ban on independent expenditures, as discussed above. Additionally, if two individuals wish to speak in favor of or against a particular candidate, such as a candidate for Speaker of the Texas House of Representatives, they may form a specific-purpose committee and do so, and will not be subject to section 253.037(a)(2)'s ten-contributor requirement. The disclosure requirements imposed on specific-purpose committees provide sufficient safeguards to inform the voting public about the source of the committee's speech. If those same two individuals instead want to form a general-purpose committee, by definition a committee *not* supporting any identified candidate and therefore far less transparent, they must find ten contributors if they wish to receive or spend more than $500.

Given the numerous other avenues open for political speech, including the formation of a specific-purpose committee of as few as two like-minded individuals, the burden imposed on Plaintiffs' associational rights by section 253.037(a)(2) is minimal.[10] Moreover, Texas has chosen

---

[10] Tellingly, no Plaintiff in this case has provided any evidence it had difficulty meeting the ten-contributor requirement. It was generally the sixty-day waiting period, not the contributor requirement, which delayed these Plaintiffs' speech.

to limit access only to one specific form of political committee, an organization entitling its members to special benefits not available to individuals. In order to access those benefits, general-purpose committees must be actual committees made up of multiple individuals.[11] Texas chose ten contributors as an appropriate limit, and its choice was not unconstitutional.

## E.    Corporate Contribution Prohibition

Plaintiff TLC finally argues section 253.094(a) is unconstitutional as applied to TLC and TLC-IPA. Specifically, TLC wishes to provide TLC-IPA with a contact list, which TLC-IPA would use to raise funds for direct campaign expenditures.[12] TLC contends the statute's corporate contribution ban cannot be justified because "the government has no anti-corruption interest in limiting contributions to an independent expenditure group." *SpeechNow.org v. FEC*, 599 F.3d 686, 695 (D.C. Cir. 2010). The TEC Defendants counter Texas may lawfully prohibit corporate contributions to entities like TLC-IPA who contribute directly to candidates.

As long ago as *Buckley*, contributions and expenditures have been treated differently. *Beaumont*, 539 U.S. at 161. The Fifth Circuit has concluded *Citizens United* "provides no reason to change [the] analysis of the validity of . . . contribution limits." *In re Cao*, 619 F.3d 410, 423 (5th Cir. 2010); *see also United States v. Danielczyk*, 683 F.3d 611, 617–19 (4th Cir. 2012) (reaching the same conclusion). The Court thus analyzes the constitutionality of section 235.094(a) under the "closely drawn" standard. *Beaumont*, 539 U.S. at 162.

---

[11] A group of only two individuals could technically form the general-purpose committee, and even engage in speech. Only if the general-purpose committee wishes to exceed $500 in contributions or expenditures must it find at least ten contributors.

[12] The contact list qualifies as a "contribution" under the statute. *See* TEX. ELEC. CODE § 251.001(2).

-30-

In regulating contributions, the government may invoke two important interests in the wake of *Citizens United*: (1) the anti-corruption interest, i.e., the government's interest in preventing actual *quid pro quo* corruption, or the appearance of such corruption; and (2) the anti-circumvention interest, i.e., the government's interest in preventing individuals from evading contribution limits by funneling money through a corporation. *See In re Cao*, 619 F.3d at 446; *Danielczyk*, 683 F.3d at 618–19.

Both of these interests are implicated here. First, the anti-corruption interest is relevant because corporate contributions to TLC-IPA could be viewed by the public as corporate contributions to the candidates TLC-IPA supports. Even though TLC-IPA affirms in this Court it will not use the contact list for anything other than independent expenditures, TLC-IPA admits it has worked directly with candidates in the past and may do so again in the future, and thus is not an "IE-only" committee. Pl.'s Mot. Summ. J. [#62] at 36. Plaintiffs also admit this fact distinguishes this case from every authority cited in favor of their position. Second, the anti-circumvention interest is implicated because corporations could simply donate unlimited funds to such "hybrid" groups and thereby avoid valid contribution limits placed on the corporation itself. *Cf. Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 197–98 (1981) (invoking anti-circumvention rationale to uphold contribution restriction which could otherwise be evaded by channeling funds through multicandidate PACs).

As one district court recently explained the dilemma:

> When a single entity is allowed to make both limited direct contributions and unlimited independent expenditures, keeping the bank accounts for those two purposes separate is simply insufficient to overcome the appearance that the entity is in cahoots with the candidates and parties that it coordinates with and supports. Although such an entity may maintain separate bank accounts, it need not maintain separate management or hold itself out to the public as engaging in two distinct

activities. Thus from the perspective of any citizen who does not scrutinize the entity's bank statements, all of the entity's spending (direct contributions and express advocacy communications) is coming from the same place. . . . To conclude that a "hybrid" PAC's direct contributions to (and attendant coordination with) candidates and parties do not infect, or appear to infect, all of its operations in the political arena is naive and simply out of touch with the American public's clear disillusionment with the massive amounts of private money that have dominated the political system, particularly since *Citizens United*.

*Stop This Insanity v. FEC*, No. 12-1140 (BAH), 2012 U.S. Dist. LEXIS 158051, at *56–57 (D.D.C. Nov. 5, 2012).

The danger is even more severe in this case. Even if TLC-IPA maintains separate bank accounts, there is no way to ensure a list of contacts—essentially just information—will only be used for independent expenditures.[13] The informational wall TLC-IPA asserts it can raise to keep its independent expenditure activities entirely separate from its direct campaign contribution activities is thin at best. This triggers the precise dangers of corruption, and the appearance of corruption, which motivated the Court in *Buckley* to uphold the challenged contribution limits. 424 U.S. at 638.

TLC-IPA's hybrid status is also the reason upholding section 253.094(a) does not conflict with any of the authorities cited by Plaintiffs in support of their argument. As the D.C. Circuit clearly explained in *SpeechNow*, "the government has no anti-corruption interest in limiting contributions to an independent expenditure group." 599 F.3d at 695. Read in light of the newly developed hybrid PAC idea, what the court meant was "the government has no anti-corruption interest in limiting contributions to an independent expenditure-*only* group."[14] This makes sense given *Citizen United*'s

---

[13] The situation is even more absurd where, as here, TLC and TLC-IPA are run by the same individual out of the same office. Sevilla Depo. at 49:12–17.

[14] SpeechNow had stated it intended "to operate *exclusively* through 'independent expenditures.'" *SpeechNow*, 599 F.3d at 689 (emphasis added).

-32-

holding independent expenditures pose no corruption threat because independent expenditures by definition are not coordinated with candidates. *See* 558 U.S. at 360 ("[I]ndependent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption."). But *Citizens United*'s holding is irrelevant where a group like TLC-IPA engages in both independent and coordinated advocacy. The fact TLC wishes to contribute information rather than funds only exacerbates the problem, because information cannot be segregated in a separate account. Even if it could, the public, and even the TLC contributors on TLC's separate list, could justifiably assume a donation to TLC-IPA could be used to support the candidates who benefit from TLC-IPA's direct contributions.

The Court therefore finds the authorities cited by Plaintiffs materially distinguishable. *See Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) (invalidating contribution limit "as applied to organizations, like the Right to Life PAC, that engage only in independent expenditures for political speech"); *SpeechNow*, 599 F.3d at 696 (invalidating contribution limits only "as applied to contributions to SpeechNow, an independent expenditure-only group"); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 698–99 (9th Cir. 2010) (invalidating contribution limits as applied to "independent expenditures committees"); *N.C. Right to Life, Inc. v. Leake*, 344 F.3d 418, 434 (4th Cir. 2003), *vacated*, 541 U.S. 1007 (2004) (invalidating contribution limit as applied to "independent expenditure political action committees"). This even holds true for a recent case before this Court, in which Judge Yeakel granted a preliminary injunction. *See Texans for Free Enter. v. Reisman*, No. A-12-CA-845-LY, slip op. at 10–11 (W.D. Tex. Dec. 6, 2012), *appeal docketed*, No. 13-50014 (5th Cir. Jan. 9, 2013) (without "engag[ing] in a full analysis of all matters," finding a likelihood of success on the merits of a constitutional

challenge to a contribution limit as applied to a "direct-campaign-expenditure-only political committee").

Texas has a real interest in regulating corporate contributions in order to prevent corruption and circumvention of its campaign finance laws. The United States Supreme Court recognized as much in *Colorado Republican*: "if a candidate could be assured that donations through a party could result in funds passed through to him for spending on virtually identical items as his own campaign funds, a candidate enjoying the patronage of affluent contributors would have a strong incentive not merely to direct donors to his party, but to promote circumvention as a step toward reducing the number of donors requiring time-consuming cultivation." 533 U.S. at 460. To avoid this unsavory state of affairs, the Texas legislature chose to prohibit certain corporate contributions. As applied to TLC and TLC-IPA, section 253.094(a)'s contribution prohibition is closely drawn to match a sufficiently important interest, and therefore is not unconstitutional.

## Conclusion

The Court concludes sections 253.037(a) and 253.094(a) are constitutional as-applied to the Plaintiffs. The odd nature of the overbreadth doctrine nevertheless makes it necessary to consider whether the statutes are overbroad even though they do not violate the rights of the parties present before the Court. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 429 U.S. 469, 484 (1989). The Court therefore considers Plaintiffs' facial challenges, and rejects them. Section 253.037(a) applies to all general-purpose committees equally and without difference, and thus if it is constitutional as-applied to the Plaintiffs, it is hard to imagine how any number—let alone a substantial number—of its applications could be unconstitutional. Section 253.094(a) is slightly different, as the Court's

conclusion here rests on TLC-IPA's identity as a "hybrid" PAC. Independent expenditure-only PACs may counsel a different result. However, on the record before the Court, there is insufficient evidence to conclude a substantial number of section 253.094(a)'s applications are unconstitutional, especially when compared to the statute's plainly legitimate sweep encompassing organizations like TLC-IPA, and the Court therefore rejects Plaintiffs' facial challenge to that statute as well.

Finally, Defendant Susan Reed has also moved for summary judgment, though her motion cites no authority and simply recites arguments previously rejected by the Court. The rejection of all Plaintiffs' constitutional challenges to the provisions of the Texas Election Code benefits Reed, however, because she was included in this case only to prevent her from enforcing any statutory provisions ruled unconstitutional. Reed's motion for summary judgment will therefore be granted alongside the TEC Defendants' motion.

Accordingly,

IT IS ORDERED that Defendants Hugh Akin, Jim Clancy, Tom Harrison, Paul Hobby, Bob Long, Paula Mendoza, Tom Ramsay, David Reisman, and Chase Untermeyer's Motion for Summary Judgment [#60] is GRANTED;

IT IS FURTHER ORDERED that Plaintiffs Catholic Leadership Coalition of Texas, Texas Leadership Coalition-Institute for Public Advocacy, Friends of SAFA Texas, and Texas Freedom PAC's Motion for Summary Judgment [#62] is DENIED;

IT IS FINALLY ORDERED that Defendant Bexar County Criminal District Attorney Susan Reed's Second Motion to Dismiss or, in the alternative, Motion for Summary Judgment [#61] is GRANTED.

SIGNED this the 30th day of May 2013.

SAM SPARKS
UNITED STATES DISTRICT JUDGE